**AMERICAN MAIL LINE, Limited**
v.
**GUY F. ATKINSON CO.**
**Civ. No. 6933.**

United States District Court
D. Oregon.
April 30, 1954.

William F. White (White, Sutherland and Parks), Portland, Or., and John Ambler (Grosscup, Ambler, Stephan & Miller), Seattle, Wash., for libelants.

Erskine B. Wood (Wood, Matthiessen, Wood & Tatum), Portland, Or., for respondent.

SOLOMON, Judge.

Libelant, owner of the SS Oregon Mail, seeks to recover $14,328.35 from respondent for damages to such vessel resulting from a fire on October 27, 1949. Libelant contends that the fire was caused by negligence of respondent's employees when they welded a bracket and door stop on the steel inboard bulkhead of the vessel's No. 1 diffuser room.

Libelant relies on the theory of *res ipsa loquitur* and, in the alternative, on evidence which it claims shows that respondent's employees either negligently burned a hole in the bulkhead, or, there already being a hole in the bulkhead which they saw or should have seen, negligently allowed slag and sparks to pass through the hole and ignite wooden braces and forms behind the insulated bulkhead. The bulkhead was between a fan room and a reefer box.

In addition to the defense of laches and an exculpatory clause in the contract, respondent contends that the fire, discovered ten hours after completion of the welding, was of unknown origin, and did not result from conduct of respondent's employees. Respondent further claims libelant and its officers and employees were contributorily negligent in failing to maintain a proper fire watch, adequate alarm system, proper and regular inspection, and in failing to discover and extinguish the fire before it caused serious damage.

The facts upon which the libel is founded arise out of a voyage repair contract, covering specifications for repair of The Oregon Mail, entered into by the parties on October 21, 1949. On the basis of the pretrial order and the evidence adduced at the trial, I find:

1.

Libelant, American Mail Line Ltd., is a Delaware corporation and owner of the SS Oregon Mail. Respondent, Guy F. Atkinson Company is a Nevada corporation doing business in Oregon as Willamette Iron and Steel Company. It has a place of business within this district in the City of Portland, Oregon.

2.

The facts admitted in the pretrial order are true and correct.

3.

On or about October 20, 1949, libelant submitted to various ship repairers in Portland, Oregon, "Specifications for Repairs" on the SS Oregon Mail. These were voyage repairs.

4.

Item 5 of the "Specifications for Repairs" was

"*Stops—Refrigerated Cargo Room Doors* Fair and reweld in position two (2) refrigerated cargo door stops, one (1) at No. 1 box and one (1) at No. 9 box."

5.

Respondent bid on the repairs on October 21, 1949, as follows:

"We hereby agree to faithfully carry out and complete all the repairs, renewals and replacements to the SS 'Oregon Mail' as set forth in specifications dated October 20, 1949 and to abide by all the conditions expressed or implied therein, for the sum of Two Thousand Nine Hundred Sixty-four Dollars ($2,964.00) and to complete all repairs on or before Friday, October 28, 1949, as specified."

Respondent's offer was accepted by libelant.

**6.**

On October 27, 1949, respondent's employees boarded the vessel which was then berthed at the Vancouver grain dock at Vancouver, Washington, and proceeded to make certain repairs including the door stop in item No. 5.

**7.**

On October 27, 1949, respondent's employees installed a door stop for No. 1 reefer box, which is located on the third deck of the Oregon Mail on the port side of No. 4 hatch. No. 3 reefer box is immediately forward of No. 1 reefer box. An insulated bulkhead is between the two reefer boxes. No. 1 diffuser room is located in the inboard forward corner of No. 1 reefer box, and on the opposite side of the bulkhead diffuser room. No. 3 diffuser room is located in the after inboard corner of No. 3 reefer box.

**8.**

Door stops of the type here involved are frequently loosened by ordinary abuse during voyages.

**9.**

The door stop was welded to the bulkhead and, at such point, was made of hollow metal tubing about 1 inch in diameter and, if in position, would be about 6 feet above and parallel to the floor. It was about 20 inches long between the welded ends and projected about 20 inches from the bulkhead. Insulated pipes ran vertically along and parallel to the bulkhead close to the welding area.

**10.**

The bulkhead structure may be analogized to a sandwich. The bulkhead was ¼ inch thick. The face of the steel opposite the welding side was coated with bitumastic. About 10 inches from the steel bulkhead, on the reefer box side, was ¾ inch plywood sheathing. The area between was filled with fibre glass insulation and contained steel stiffeners about ¼ x 4 inches spot welded to the steel bulkhead. The stiffeners were faced on the forward side with wood studding for the sheathing. The corner of each stiffener was cut away at the bottom toward the bulkhead so that it had a trapezoid, rather than oblong, shape. The wood studding was about 24 inches apart on the centers. This area was floored with a wooden sill.

**11.**

Before this repair was made, only one end of the door stop was fastened to the bulkhead. The other end was loose. If the loose end were in place, the after side of a metal stiffener on the inside face of the steel bulkhead would be virtually tangential to a point on the inside face of the bulkhead opposite to where the loose end would be fastened.

**12.**

To reweld the door stop, the loose end of the door stop was held to the bulkhead, over the point where it had previously been fastened. Then, at a comparatively low welding temperature, the welder put small spot welds around the circumference of the door stop, connecting and fastening the door stop to the surface of the bulkhead. This welding was completed prior to 11 a. m. on October 27, 1949.

**13.**

Only electric arc welding equipment was employed in fastening the door stop. While an acetylene torch was on board, it was not employed in connection with the rewelding of the door stop or any other work in that vicinity.

**14.**

Before this welding was commenced, some remains of earlier circumferential welding were present and formed a socket, not necessarily continuous, into which the loose end of the door stop fit.

**15.**

A small hole, not over ¼ inch in diameter, made by burning through the bulkhead at some unestablished time was in the center of this socket and, on the inside of the bulkhead, the hole was adjacent to the stiffener.

**16.**

Between 2 p. m. and 3:30 p. m., various members of the crew noted an acrid odor in the reefer box but discovered nothing wrong.

**17.**

The reefer box held no cargo on October 27, 1949. Members of the crew entered the reefer box during the day and members of the crew and others were in the fan room and in the general area of the fire. Longshoremen were lining the hold of Number 4 hatch, in which the fan room was located, preparatory to loading a grain cargo. The longshoremen left the vessel at approximately 5 p. m.

**18.**

The precise point at which the fire originated has not been established.

**19.**

At about 9:06 p. m., October 27, 1949, a fire was discovered in No. 4 hatch of the vessel. The Vancouver, Washington fire department was promptly summoned and quickly arrived. Despite difficulty in locating the fire, which was burning with considerable smoke but slight heat, the fire department extinguished the fire. The firemen necessarily employed large quantities of water which, together with the fire, caused extensive damage to sheathing, studding, decking, and other portions of the vessel.

**20.**

Libelant sustained $14,328.35 damages as a result of the fire.

**21.**

The cause of the fire has not been established.

### Discussion

To establish that the fire was proximately caused by the welding, it would be necessary for me to accept as established certain selected portions of the evidence introduced by libelant and reject other portions of libelant's evidence, as well as all of the respondent's evidence. Then, from such selected portions of libelant's evidence, it would be necessary for me to draw only those inferences which are consistent with the libelant's theory of causation and, at the same time, reject all other inferences that may be drawn from the same evidence, even though such other inferences are equally, if not more, plausible.

The ultimate finding essential to libelant's recovery is that drops of weld metal discovered after the fire fell through a small hole in the bulkhead immediately next to the place where the door stop was being welded to the bulkhead and that such drops of hot metal dropped approximately 6 feet and landed on a wooden sill which smouldered for approximately 10 hours before bursting into flames. In order to do this, I must find:

That the drops of weld metal discovered on the floor were not there prior to the fire.

That portions of such metal fell through a tiny hole at the time respondent's employees were spot welding the door stop.

That the bulkhead, which was filled with fire resistant insulating material, had an air pocket 6 feet in depth immediately under this tiny hole.

That some of these drops of weld metal landed on the sill.

That such weld metal retained sufficient heat at the time it fell on the sill to ignite the sill.

That there was sufficient oxygen in the bulkhead to permit the sill to smoulder for approximately 10 hours prior to the time it burst into flames.

The evidence on each of these points was in sharp conflict. For example, there was testimony that the bulkhead was packed fairly tight with fire resistant insulation, that the drops of metal could not penetrate such insulation more than an inch or two and would quickly lose their heat in the process, and that even if weld metal did drop approximately 6 feet by reason of an air pocket

created because of its proximity to the stiffener, the probabilities of causing a fire were about one in a thousand.

 This pyramid of inferences presents an abstract possibility of causation. There is no substantial evidence which would enable a court to find that libelant has proved its claim by a preponderance of the evidence.

As an alternative theory, libelant contends that the fire itself, particularly in view of the fact that welding is dangerous as a source of fire and fires on shipboard are rare, affords an inference of negligence by the application of the doctrine of *res ipsa loquitur*. However, all of the authorities agree that such inferences are not mandatory but merely permissive but, if drawn, are sufficient to sustain a judgment.

To hold for libelant, it would be necessary to apply the fallacious doctrine of *post hoc ergo propter hoc*. However, even if I found that the facts of this case were sufficient to apply the theory of *res ipsa loquitur*, in view of all the other evidence in the case, I would still find that the libelant has failed to sustain the burden of proof.

I have read and considered the able memoranda of authorities submitted by libelant on the numerous issues raised in the case. However, they are no substitute for evidence.

In view of the above findings and opinion, it is unnecessary for me to consider defendant's defenses based upon laches and the exculpatory clause in the contract. I therefore make the following

### Conclusions of Law

1.

This Court has jurisdiction over the subject matter and the parties to this libel.

2.

Libelant, American Mail Line Ltd., has not sustained the burden of proof that respondent's negligence was the proximate cause of the fire aboard the SS Oregon Mail on October 27, 1949.

3.

Respondent may have an order dismissing this libel, each party to bear its own costs.